IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

ERESHA G. SMITH                                                                                    PLAINTIFF

      V.                                         Civil No. 2:15-cv-02031-MEF

CAROLYN W. COLVIN, Commissioner,
Social Security Administration                                                                    DEFENDANT

## MEMORANDUM OPINION

      Plaintiff, Eresha G. Smith, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 423(d)(1)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

### I. Procedural Background

      Plaintiff protectively filed her application for DIB on April 16, 2012, alleging a disability onset date of April 15, 2010, due to "neck, back, shoulders injury due to car accident, kidney problems." (T. 109-112, 131) The Commissioner denied her application initially on June 4, 2012 (T. 64-66), and denied it at reconsideration on November 6, 2012 (T. 72-73). Plaintiff requested an administrative hearing (T. 76-77), and the hearing was held on April 16, 2013, before the Hon. Harold D. Davis, Administrative Law Judge ("ALJ"). (T. 26-61) Plaintiff was present and represented by her attorney, Andrew Flake. (T. 26, 28) Also present was Donna Humphries, a vocational expert ("VE"). (T. 28)

At the time of hearing, Plaintiff was 41 years old with a high school education and one year of cosmetology school. (T. 33) She had past relevant work ("PRW") experience as a child care worker and home health aide. (T. 35-36, 56, 132, 144)

On August 16, 2013, the ALJ issued an unfavorable decision finding that Plaintiff had the following severe impairments: hypertension, osteoporosis, asthma, lumbago, myofascial pain disorder, status post pediatric cancer treatment, neuropathy, depression, and anxiety. (T. 12) The ALJ further found that Plaintiff did not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (T. 12-14) After partially discrediting Plaintiff's subjective complaints, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work, except that she could only work in a controlled environment, in which there is no exposure to temperature changes or concentrated amounts of dust, fumes, or smoke, and she would be limited to work involving simple tasks and simple instructions and only incidental contact with the public. (T. 14-19)

With the help of the VE, the ALJ determined Plaintiff could not perform her PRW (T. 19-20), but that she could perform the requirements of representative occupations such as hand packager (DOT 920.687-082; light, unskilled), with 1,000 such jobs existing in Arkansas and 150,000 in the national economy; small products assembler (DOT 706.684-022; light, unskilled), with 3,000 such jobs in Arkansas and 400,000 in the national economy; and, inspector (DOT 712.684-050; light, unskilled), with 2,000 such jobs in Arkansas and 285,000 in the national economy. (T. 20-21) The ALJ then found Plaintiff had not been under a disability, as defined by the Act, from April 15, 2010 through the date of the decision. (T. 21)

The Appeals Council denied Plaintiff's request for review on December 13, 2014. (T. 1-3) Plaintiff filed this action on February 13, 2015. (Doc. 1) This case is before the undersigned by consent of the parties. (Doc. 5)  Both parties have filed appeal briefs (Docs. 12, 13), and the case is now ready for decision.

## II.  Applicable Law

This court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v.* Astrue, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C.

§ 423(d)(3). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. § 404.1520(a)(4). Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. § 404.1520(a)(4)(v).

### III. Discussion

The sole issue raised by Plaintiff on appeal is whether the ALJ erred by not ordering a psychiatric consultative examination to fully and fairly develop the record regarding her mental impairments. (Doc. 12, pp. 4-7)

The Court has thoroughly reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs and the ALJ's opinion, and they are repeated here only to the extent necessary.

The ALJ's assessment of Plaintiff's mental impairments is troubling. At the outset of the administrative hearing, the ALJ agreed to keep the record open 30 days to allow Plaintiff to submit updated treatment records from her treating psychiatrist, Dr. Chambers. (T. 28) Plaintiff's counsel

advised the ALJ that the record contained Dr. Chamber's records from August and July[1], and that he would provide updated records from September through December, 2012. (T. 54) Plaintiff explained that she was going to Dr. Chambers every two weeks until she could no longer afford to do so; that she had an appointment the day after the hearing; and, that Dr. Chambers and his therapist were helping her. (T. 54) At the conclusion of Plaintiff's testimony, the ALJ commented, "[c]ounsel, I think Dr. Chambers' records probably are going to be kind of telling," and "I'd like to see what they say." (T. 55) A the conclusion of the hearing, the ALJ addressed Plaintiff and said:

> "Ms. Smith, I don't know if I'm going to pay your case or not. I'm very much on the fence on it. A lot is going to depend on what I see from Dr. Chambers' records. He's a very good doctor." (T. 60)

The updated records from Dr. Chambers were received, and they include treatment records from September 19, 2012 through November 26, 2012, along with depression, anxiety, and other mental health assessment forms, and a Mental Impairment Questionnaire (RFC & Listings) form completed by Dr. Chambers on April 17, 2013. (T. 387-408)

At her initial visit with Dr. Chambers on July 30, 2012, Plaintiff acknowledged that she never had any previous treatment for depression and had never seen a psychiatrist. (T. 360) She reported having "a lot of things going through my mind." She complained about a change in her body shape that preys on her mind a lot, and that "I can't deal with that." She related that she is unable to get pregnant, and she stated "I cry for no reason." She endorsed having road rage and times when she has lost her hair. (T. 360) Dr. Chambers noted, "I see this all as a consequence of early stress related to the medical ordeal in which she has gone about as far with the effects as she can." (T. 360) He

---

[1] These treatment records, for office visits on July 30 and August 14, 2012, appear at T. 360-363.

started Plaintiff on Trileptal[2] and arranged for her to begin seeing a therapist. (T. 360) When Plaintiff returned on August 14, 2012, she reported moodiness, and Dr. Chambers ordered a gradual increase in the dosage of Trileptal. (T. 362) During her next visit on September 19, 2012, Plaintiff advised that her insurance would not pay for neurofeedback, and that she had not yet been able to see the therapist. Plaintiff reported being depressed, tearful, feeling pressured and agitated. Her Trileptal dosage had been increased to 750 mg per day, was not bothering her, but had not provided much effect either. Dr. Chambers ordered a further increase in Trileptal dosage, and he added Pexeva[3] to the medication regimen. During an assessment on October 4, 2012, the Beck Depression Inventory and Beck Anxiety Inventory were completed by the therapist, Linda Smallman, LCSW. The results showed severe depression (T. 403) and moderate anxiety (T. 404). Treatment notes from October 30, 2012 reflect that Plaintiff was taking Viibyrd[4] (20 mg per day), Neurontin[5], and Trileptal (1200 mg per day) that "she feels it may be bothering," so the Trileptal was decreased to 600 mg per day. (T. 407) At her next visit on November 26, 2012, she reported that she felt better for a couple of days

---

[2] An anti-convulsant medication that is sometimes used in patients with bipolar disorder. *See* www.nami.org/Learn-More/Treatment/Mental-Health-Medications/Oxcarbazepine-(Trileptal). (Last accessed March 9, 2016.)

[3] Paroxetine (Paxil, Pexeva) is a selective serotonin reuptake inhibitor (SSRI) used to treat major depressive disorder, generalized anxiety disorder, social anxiety disorder, panic disorder, obsessive compulsive disorder, posttraumatic stress disorder, and premenstrual dysphoric disorder. *See* www.nami.org/Learn-More/Treatment/Mental-Health-Medications/Paroxetine-(Paxil). (Last accessed March 9, 2016.)

[4] Also a SSRI used for the treatment of major depressive disorder. *See* www.nami.org/Learn-More/Treatment/Mental-Health-Medications/Vilazodone-(Viibyrd). (Last accessed March 9, 2016.)

[5] An anti-convulsant also used to relieve pain for certain conditions in the nervous system. *See* www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-20064011. (Last accessed March 9, 2016.)

after the Trileptal was decreased, but she "began to feel worse and her mind raced worse." (T. 408) Dr. Chambers increased the Trileptal dosage again, and he indicated that "if she encounters side effects at the same level where she is responding, we will have to go to another medicine." Plaintiff reported having good days and bad days at the current dosage level. He also noted that Plaintiff was seeing Linda (the therapist). (T. 408)

On April 17, 2013, Dr. Chambers completed a Mental Impairment Questionnaire (RFC & Listings) form. He listed Plaintiff's diagnoses as Major Depression (Axis I), hydronephrosis (Axis III), unable to conceive (Axis IV), and he estimated her GAF to be 40, with her highest GAF to be 45 during the past year. (T. 387) A GAF of 40 indicates major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood, while a GAF of 45 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TR 34 (4th ed. 2000). Regarding signs and symptoms, Dr. Chambers documented appetite disturbance with weight change; sleep disturbance; mood disturbance; emotional lability; delusions or hallucinations; difficulty thinking or concentrating; generalized persistent anxiety; and, hostility and irritability. (T. 387) Clinically, he found Plaintiff to be markedly depressed, having dreams of her unconceived child, and crying. (T. 388) He did not find her to be a malingerer. (T. 388) He did find her impairments to be reasonably consistent with the symptoms and functional limitations expressed in the evaluation; that her prognosis was guarded; and, that her psychiatric conditions exacerbate her neuropathy symptoms. (T. 388)

Regarding functional adaptation, Dr. Chambers opined that on average Plaintiff's mental impairments or treatment would cause her to be absent from work more than three times a month.

He further opined that Plaintiff would be moderately restricted in activities of daily living ("ADL's"); experience moderate difficulties in maintaining social functioning; often have deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and, that she would have repeated episodes of deterioration or decompensation in work or work-like settings which would cause her to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors). (T. 391)

After having explicitly commented at the hearing that Dr. Chambers "is a very good doctor," and that "a lot is going to depend on what I see from Dr. Chambers' records," (T. 60) the ALJ disregarded Dr. Chambers' opinions and gave them little weight. (T. 18) In large part, the ALJ discounted Dr. Chambers' opinions because "[t]here is no objective mental testing to support such significant limitations." (T. 19) As Plaintiff points out, this is incorrect as Dr. Chambers' therapist did administer both the Beck Depression Inventory and Beck Anxiety Inventory to Plaintiff. The Beck Depression Inventory is well recognized around the world, and has been found to be a highly reliable instrument for the detection of depression.[6] The Beck Anxiety Inventory has also been well recognized.[7] As previously noted, Plaintiff's scores on these tests revealed severe depression and moderate anxiety. (T. 403, 404)

---

[6] *See*, e.g., www.jad-journal.com/article/S0165-0327(13)00846-X/abstract (Last accessed March 10, 2016); Karen B. Grothe, et al., *Validation of the Beck Depression Inventory - II in a Low-Income African American Sample of Medical Outpatients*, Psychological Assessment 2005, Vol. 17, No. 1, 110-114.

[7] *See*, e.g., L. Kevin Chapman, et al., *A Confirmatory Factor Analysis of the Beck Anxiety Inventory in African American and European American Young Adults*, Journal of Anxiety Disorders 23 (2009) 387-392.

Not only did the ALJ disregard the opinions of Plaintiff's treating physician, Dr. Chambers, he also discounted the opinion of the non-examining State agency medical consultant, Cheryl Woodson-Johnson, Psy.D. (T. 19) On November 5, 2012, Dr. Woodson-Johnson opined that Plaintiff's mental impairments were "not severe." The ALJ recognized that Dr. Woodson-Johnson did not have the benefit of Plaintiff's testimony at the hearing or her psychological assessment by Dr. Chambers, and based on that new information the ALJ found Plaintiff's mental impairments were severe; but, the ALJ still gave moderate weight to Dr. Woodson-Johnson's opinion "as it recognizes that the claimant's limitations are overstated and is supported by the lack of psychological treatment undergone by the claimant." (T. 19)

Social security hearings are non-adversarial. *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) An ALJ bears a responsibility to "develop the record fairly and fully, independent of the claimant's burden to press his case." *Id*. The ALJ possesses no interest in denying benefits and must act neutrally in developing the record. *See Richardson v. Perales*, 402 U.S. 389, 410, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994). That duty may include seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped. *Smith v. Barnhart* 435 F.3d 926, 930 (8th Cir. 2006).

Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "Accordingly, the regulations provide that treating physicians or psychologists will be recontacted by the Commissioner when the medical evidence received from them is inadequate to determine a claimant's disability." *Id.*; 20 C.F.R. § 404.1520b(c)(1). In addition, "it is reversible error for an ALJ

not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985) (citing *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984)); *see also Ford v. Secretary of Health and Human Services*, 659 F.2d 66, 69 (5th Cir. 1981) (consultative psychiatric examination necessary where claimant testified to crying spells and nervousness and social worker noted emotional instability).

Here, the opinion of Dr. Woodson-Johnson was not based upon the full record in this case, and recognizing that shortcoming, the ALJ disregarded the opinion to the extent it reflected that Plaintiff's mental impairments were "not severe." The Commissioner presented no other medical evidence from a consulting physician to contradict Plaintiff's complaints of depression and anxiety. No clinical findings existed in the record as developed by the ALJ that would undermine Dr. Chambers' opinions. To the contrary, the ALJ actually relied on Dr. Chambers' more recent records to discount the "not severe" assessment of Dr. Woodson-Johnson. Absent *some* medical evidence of Plaintiff's mental RFC at the time of the hearing, the Commissioner could not meet her burden to demonstrate that Plaintiff was capable of performing work consistent with the mental RFC assessed by the ALJ. Having disregarded both the mental limitations imposed by Dr. Chambers and the mental RFC of the non-examining State agency physician, the ALJ's determination of Plaintiff's mental RFC is tantamount to the ALJ "playing doctor," a practice forbidden by law. *Pate-Fires v. Astrue*, 564 F.3d 935, 947 (8th Cir. 2009), citing *Rohan v. Chater*, 98 F.3d 966 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

The ALJ's curious decision to reject Dr. Chambers' opinions, after professing at the hearing that Dr. Chambers "is a very good doctor" and "a lot is going to depend on what I see from Dr.

Chambers' records," lacks support in the record. If the ALJ had conducted a further inquiry, he might have discovered clinical evidence supporting Dr. Chambers' opinions; and, if Dr. Chambers' opinions found support in uncontradicted clinical evidence, then those opinions could potentially receive "controlling weight" under social security regulations as the opinions of Plaintiff's treating physician. *See* 20 C.F.R. § 404.1527. At a minimum, Dr. Chambers' opinion that Plaintiff would be absent from work more than three times a month due to her mental impairments, if properly supported, would undermine the Commissioner's effort to satisfy her burden at step five of the analysis.[8] Because this evidence might have altered the outcome of the disability determination, the ALJ's failure to elicit it prejudiced Plaintiff in her pursuit of benefits. *See Snead v. Barnhart*, 360 F.3d 834 (8th Cir. 2004) (remand necessary to determine whether treating physician's evidence of underlying heart condition deserved controlling weight).

Being aware of the crucial issue of Plaintiff's severe mental impairments, the ALJ should have taken steps to develop the record sufficiently to determine whether Dr. Chambers' opinions deserved controlling weight. With this central and potentially dispositive issue unexplored by the ALJ, the Court has no confidence in the reliability of the mental RFC upon which the ALJ based his decision, and remand is necessary.

On remand, the ALJ is directed to re-contact Plaintiff's treating physician, Dr. Chambers, to obtain updated treatment records and to seek clarification regarding Plaintiff's mental RFC. Any questions the ALJ has concerning Dr. Chambers' mental RFC assessment should also be addressed, allowing Dr. Chambers the opportunity to provide an explanation for the restrictions assigned. In

---

[8] The VE, in response to a hypothetical question, testified that there would be no jobs available for an individual who, due to chronic illness, would miss four days of work per month on average. (T. 58)

addition, and in order to determine whether other clinical evidence may support Dr. Chambers' opinions, the ALJ is directed to order a consultative psychological examination complete with a mental RFC assessment.

### V. Conclusion

Accordingly, the Court concludes that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this 11th day of March, 2016.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE